UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

KEVIN FRYE                                    DEMAND FOR JURY TRIAL

Plaintiff

v.

T-MOBILE USA, INC.

Defendant

_____/

## VERIFIED COMPLAINT

COMES NOW the Plaintiffs, Kevin Frye, through undersigned counsel, (herein referred to as "Plaintiff" or "Frye") and states in support as follows:

## NATURE OF THE ACTION

This is an action for COUNT I: VIOLATION OF THE FEDERAL COMMUNICATIONS ACT, COUNT II: NEGLIGENCE, COUNT III: GROSS NEGLIGENCE, COUNT IV: NEGLIGENT HIRING, RETENTION AND SUPERVISION, COUNT V: VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT.

## INTRODUCTION

1.      This action arises out of T-Mobile USA, Inc.'s (hereinafter "T-Mobile") systemic and repeated failures to protect and safeguard its customers' highly sensitive personal and

1

financial information against common, widely reported, and foreseeable attempts to illegally obtain such information.

2.     As a result of T-Mobile's misconduct as alleged herein, including their gross negligence in protecting customer information, its negligent hiring and supervision of customer support personnel and its violations of federal and state laws designed to protect wireless service consumers, Plaintiff lost 1.91130741 bitcoin ("BTC"), with a current estimated value in excess of $87,000 due to an account takeover scheme (also known as a "SIM-swap") which could not have occurred but for Defendant's intentional actions and negligent practices, as well as their repeated failure to adhere to federal and state laws.

## PARTIES

3.     Plaintiff Kevin Frye is a resident of Broward, County, Florida.

4.     Defendant is a Delaware corporation with a principal place of business in the State of Washington.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of Plaintiff's claims pursuant to 28 U.S.C. §§1331, as this case arises under federal statutes, such as the Federal Communications Act ("FCA") at 47 U.S.C. §222, the Stored Communications Act ("SCA") at 18 U.S.C. §2701, and the Computer Fraud and Abuse Act ("CFAA") at 18 U.S.C. §1030.

6.     Furthermore, the Court has jurisdiction under 28 U.S.C. §1332 in that the amount in controversy exceeds $75,000.00, inclusive of attorney fees, costs, and statutory interest, and Plaintiff and Defendant are citizens of different states.

7.     Venue is proper in this court as the events relevant to this action occurred in the County of Broward, which is located in the United States District Court for the Southern District of Florida.

8.     Pursuant to the Court's supplemental jurisdiction under 28 U.S.C. §1367, it may entertain the state law claims as they are derived from a common nucleus of operative facts.

9.     The Defendant has established minimum contacts within Florida subjecting them to jurisdiction herein.

10.     Plaintiff Frye entered into a contract with Metro by T-Mobile (hereinafter "T-Mobile") in approximately 2013.[1]

11.     Defendant T-Mobile provided their services in Broward County, Florida and Plaintiff Frye utilized cell towers operated by the Defendant in Broward County, Florida.

12.     T-Mobile, by operating, conducting, engaging in, or carrying on a business venture in the State of Florida, T-Mobile availed itself to the personal jurisdiction in the State of Florida, pursuant to section 48.193(1)(a), Florida Statutes.

13.     T-Mobile availed itself to the personal jurisdiction of the State of Florida by soliciting business within the State, pursuant to section 48.193(1)(f)(1), Florida Statutes.

---

[1] In 2012, T-Mobile merged with and acquired Metro.

3

14.    T-Mobile availed itself to personal jurisdiction in the State of Florida by engaging in substantial business activity within the state, pursuant to Section 48.193(2), Florida Statutes.

15.    T-Mobile's actual interactions establish a physical presence within the State of Florida. The commercial quality and interaction with businesses and individuals within the State of Florida establish a "plus" factor to establish sufficient minimum contacts. Cf. Roblor Mktg. Group, Inc. v. Gps Indus., Inc., 645 F. Supp. 2d 1130 (S.D. Fla. 2009).

16.    The plaintiff's claims all arise out of or relate to the defendant's contacts with the forum thus satisfying the Fourteenth Amendment's Due Process Clause.

17.    All conditions precedent to this action have been met through performance, or otherwise.

18.    Plaintiff has retained the undersigned law firm to represent it in this action and is obligated to pay the firm a reasonable fee for its services.

## GENERAL BACKGROUND

19.    T-Mobile markets and sells wireless cellular phone service through standardized wireless service plans via various retail locations, online sales, and over the telephone.

20.    T-Mobile has approximately 1,015 stores in Florida and approximately 119 stores in South Florida, including Fort Lauderdale.

21.    The Defendant has a substantial advertising budget in Florida where it

estimated they spend millions annually marketing their services to residents of South Florida.

22.    T-Mobile maintains accounts for its wireless customers, enabling them to access information about the services they purchase from T-Mobile.

23.    It is widely recognized and has been widely publicized that mishandling of customer wireless accounts, including, but not limited to, allowing unauthorized access, can facilitate identity theft and related consumer harm.

24.    Numerous instances of mishandling of customer account information have occurred at T-Mobile.

25.    As one of the nation's largest wireless carriers, T-Mobile's operations must comply with various federal and state statutes, including (but not limited to) the Federal Communications Act ("FCA") 47 U.S.C. §222.

26.    The FCA obligates T-Mobile to protect the "confidential proprietary information of [its] customers" and "customer proprietary network information" (commonly referred to as "CPI" and "CPNI", respectively). See 47 U.S.C. §222(a), (c).

27.    The Federal Communications Commission ("FCC") has promulgated rules to implement Section 222 of the FCA "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." 1998 CPNI Order, 13 FCC Rcd. at 8195 ¶193; see also 47 C.F.R. §64.2001 et seq. ("CPNI Rules").

28.     The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. See 47 C.F.R. §64.2005.

29.     The CPNI Rules also require carriers to implement safeguards to protect customers' CPNI. See 47 C.F.R. §64.2009(b), (d), and (e).

30.     These safeguards include: (a) training personnel "as to when they are and are not authorized to use CPNI"; (b) establishing "a supervisory review process regarding carrier compliance with the rules"; and (c) filing annual compliance certificates with the FCC. Id.

31.     The CPNI Rules further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." See 47 C.F.R. §64.2010(a).

32.     T-Mobile regularly holds itself out to the general public as a secure and reliable custodian of customer data, including customer's confidential financial and personal information.

33.     T-Mobile maintains that it uses a variety of "administrative, technical, contractual, and physical safeguards" to protect customers' data "against security incidents, and illegal, fraudulent, or unauthorized activities; investigate suspicious traffic, cybersecurity threats or vulnerabilities, complaints, and claims; authenticate

your credentials for account access and information and provide other security protections, as of August 9, 2021, *See* https://www.t-mobile.com/privacy-center/our-practices/privacy-policy.

34.     As an example, T-Mobile explicitly states that "when you contact us by phone or visit us in our stores, we have procedures in place to make sure that only the primary account holder or authorized users have access."

35.     Upon information and belief, T-Mobile's sales and marketing materials make similar representations regarding T-Mobile's alleged implementation of various safeguards to protect its customers' private information (as required by statutes).

36.     T-Mobile's deceptive statements are designed to cover up for the fact that it is aware that their security procedures can and do fall short of their expressed and implied representations and promises, as well as their statutory duties.

37.     Such failures, which lead to unauthorized access of customers' information, were entirely foreseeable by T-Mobile.

**SIM CARD SWITCH**

38.     As T-Mobile is aware, various forms of account takeover fraud have been widely reported in the press, by government regulators (including the Federal Trade Commission ("FTC") and the FCC), academic publications, and multiple lawsuits across the country.

39.     These illegal schemes involve criminals and fraudsters gaining access to or

"hijacking" customer wireless accounts, which often include sensitive personal and financial information, to induce third parties to conduct transactions with individuals they believe to be legitimate or known to them.

40.     Sometimes these schemes are perpetrated by employees of the wireless carriers, such as T-Mobile.

41.     One of the most damaging and pervasive forms of account takeover fraud is known as a "SIM-Swap", whereby a third-party (with the help of a wireless carrier like T-Mobile) is allowed to transfer access to a customer's cellular phone number from the customer's registered "subscriber identity module" card (or "SIM card") – to a SIM card controlled by the third party.

42.     A SIM Card has a complete record of a user's cell phone history, inclusive of text messages, calls, and any Apps which a user has downloaded.

43.     A SIM swap is when a hacker convinces a carrier to switch a phone number over to a SIM card they own. Once a hacker has access to the phone number then they control the text-based two-factor authentication checks specifically designed to add a layer of protection to sensitive accounts such as bank accounts, social media accounts, and email accounts.

44.     The wireless carrier, however, must effectuate the SIM card reassignment and, therefore, "SIM-swapping" is not an isolated criminal act, as it requires the wireless carrier's active   involvement to swap the SIM containing information regarding its customer to an unauthorized person's phone.

45.     Indeed, unlike a direct hack of data, whereby a company like T-Mobile plays a more passive role, SIM-swaps are ultimately effectuated by the wireless carrier itself. For instance, in this case, it is T-Mobile that approved and allowed the SIM card change (without Plaintiff's authorization), as well as all of the subsequent telecommunication activity that was used to access Plaintiff's online accounts and cause the injuries suffered by Plaintiff.

46.     As such, by directly or indirectly exceeding the authorized access to customer accounts, wireless carriers such as T-Mobile may be liable under state and federal statutes, such as the Federal Communications Act ("FCA").

47.     Once a third-party has access to the legitimate user's SIM card data, it can then seamlessly impersonate that legitimate wireless customer (e.g., in communicating with others or contacting various vendors).

48.     A common target of SIM-swapping and account takeover fraud are individuals known, or expected, to hold cryptocurrency, because account information is often contained on users' cellular phones, allowing criminals to transfer the legitimate user's cryptocurrency to an account the third-party controls.

49.     The Federal Communications investigated T-Mobile and on February 28, 2020 released a report which read as follows:

*The American public and federal law consider such information highly personal and sensitive—and justifiably so. As the Supreme Court has observed, location data associated with wireless service "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political,*

*professional, religious, and sexual associations."[4] Section 222 of the Communications Act requires carriers to protect the confidentiality of certain customer data related to the provision of telecommunications service, including location information. The Commission has advised carriers that this duty requires them to take "every reasonable precaution" to safeguard their customers' information. The Commission has also warned carriers that the FCC would "[take] resolute enforcement action to ensure that the goals of section 222 are achieved.*

*Today, we do exactly that. In this Notice of Apparent Liability, we propose a penalty of $91,630,000 against T-Mobile USA, Inc. (T-Mobile or Company) for apparently violating section 222 of the Communications Act and the Commission's regulations governing the privacy of customer information. We find that T-Mobile apparently disclosed its customers' location information, without their consent, to third parties who were not authorized to receive it. In addition, even after highly publicized incidents put the Company on notice that its safeguards for protecting customer location information were inadequate, T-Mobile apparently continued to sell access to its customers' location information for the better part of a year without putting in place reasonable safeguards—leaving its customers' data at unreasonable risk of unauthorized disclosure.[2]*

50.     The prevalence of SIM-swap fraud and T-Mobile's knowledge of such fraud, including, but not limited to, that performed with the active participation of its own employees, demonstrate that what happened with Plaintiff's account was neither an isolated incident nor an unforeseeable event.

51.     As a regulated wireless carrier, T-Mobile has a well-established duty – one which it freely acknowledges on its corporate website – to protect the security and privacy of CPI and CPNI from unauthorized access and T-Mobile is obligated to certify its compliance with this mandate to the FCC every year.[3]

---

[2] In the Matter of T-Mobile USA, Inc., File No. EB-TCD-18-00027702 (February 28, 2020), page 1786.

[3] See, e.g., https://www.t-mobile.com/privacy-center/education-and-resources/cpni.

52.     The prevalence of SIM-swap fraud and T-Mobile's knowledge of such fraud, including, but not limited to, that performed with the active participation of its own employees, demonstrate that what happened with Plaintiff's account was neither an isolated incident nor an unforeseeable event.

53.     As a regulated wireless carrier, T-Mobile has a well-established duty – one which it freely acknowledges on its corporate website – to protect the security and privacy of CPI and CPNI from unauthorized access and T-Mobile is obligated to certify its compliance with this mandate to the FCC every year.

54.     The FCA expressly restricts carriers like T-Mobile from unauthorized disclosure of CPNI.

55.     In light of the above, at the time of the events at issue in the present case, T-Mobile  was keenly aware of its obligations, as well as multiple weaknesses in its internal processes and procedures to authenticate legitimate customers.

56.     The failure of T-Mobile to have proper safeguards and security measures as recommended by the FCC resulted in damages to Plaintiff in an amount to be determined at trial.

**FACTUAL ALLEGATIONS**

57.     Plaintiff Frye has been a T-Mobile customer since approximately 2013 and has had the phone number 954-290-7877.

58.     Plaintiff was using his phone on or about July 6, 2021 when suddenly he had no service. This was not uncommon however and the Defendant thought coverage

was out due to the discussion of an impending storm.

59.    When Frye attempted to make a call he received a message that he needed to register his device.

60.    On or about July 7, 2021, Plaintiff Frye visited the T-Mobile store at 9180 W State Rd 84, Davie, FL 33324. A T-Mobile representative informed Frye that he had just purchased a new phone that his number had been ported over to that device.

61.    Frye was told by a representative that numbers get ported over by accident all the time.

62.    A T-Mobile Representative then ported the number back to his phone. No identification or password/security pin was required in order to port Frye's number back to his phone.

63.    Subsequently, Frye had to reset his password by literally telling a representative over the phone his new password, there was never an option to discreetly enter his own password, which allowed representatives from T-Mobile to access the account and/or change the password at any time.

64.    While in the local T-Mobile Store in Davie, Florida, a T-Mobile Representative informed Frye that hackers wouldn't have been able to get access to his apps. However, representatives failed to caution Frye to check his email account and change his passwords.

65.    Upon information and belief, it was via email that hackers were able to access and gain control of Frye's passwords, including but not limited to, his Coinbase

Account.

66.    After regaining use of his phone, Plaintiff logged into his Coinbase Account and his Wells Fargo Account only to see everything appeared normal, his account balances were the same as before.

67.    T-Mobile personnel should have been trained properly in order to inform Frye to immediately freeze all his accounts and change all his passwords.

68.    Subsequently, on or about July 12, 2021, Frye received a message from Well Fargo that his account was about to be overdrawn. Upon logging into his Wells Fargo account, he discovered that he had been hacked.

69.    The hackers effected ACH Transfers from his Wells Fargo Account to his Coinbase Account in the amount of $1,000.00 and $536.00 on July 9, 2021.

70.    The hackers continued making smaller transfers until July 13, 2021 when they attempted transfers of $15,000.00 and $34,400.00, which triggered the notification from Wells Fargo that his account was to be overdrawn.

71.    Had the hackers not attempted to overdraw the Wells Fargo Account, which triggered a warning message, then Plaintiff would also have lost all the money in his Wells Fargo Account.

72.    Subsequently, Frye attempted to login to his Coinbase Account, which is when he discovered that he couldn't log in. The hackers had changed his password and withdrawn 1.91130741 Bitcoin, worth a current estimated value of $87,000.00, based upon the market valuation at the time this complaint was written.

73.     On August 2, 2021, T-Mobile sent Frye a letter acknowledging that there were two independent security breaches (See attached Exhibit "A").

74.     According to T-Mobile, the first security breach occurred at 6:27:22 PM CST and lasted until 6:38:08 PM CST.

75.     According to T-Mobile, the second security breach occurred the following day on July 7, 2021 at 6:31:25 PM CST and lasted until 6:45:14 PM CST.

76.     During the breach, the hackers were able to disable Coinbase's notification system, thus enabling them to make numerous undetected transfers from Frye's Account. The hackers placed filters which sent all the email notifications from Coinbase directly to Frye's Spam email account.

## LACK OF SECURITY PROTOCOLS

77.     T-Mobile has been on notice for years that their security measures were not adequate. Despite this, sufficient security measures were not in place to prevent this SIM Card swap and the corresponding theft.

78.     A SIM swapping attack is otherwise known as SIM splitting, SIMjacking, SIM hijacking, and port-out scamming. It's a scam that happens when fraudsters use the weakness of two-factor authentication and verification which involves the second step of the process receiving a text message or phone call to your cellphone number.

79.     Despite this knowledge of inherent security flaws, T-Mobile and its Officers and directors acted with a conscious and reckless disregard of the security of

customers, failing to ratify and implement policies that would protect its customers' accounts.

80.   A valid driver's license and a valid pin/security code should have been required in order to port a number to a new phone.

81.   Security measures should have been in place which required the original SIM to be present in order for that information to be placed onto a new device.

82.   The fact that Frye's number was ported over without the original Sim device being present and without a valid ID corroborating Frye's identity point to either completely substandard security procedures or this being an inside job by a T-Mobile Representative.

83.   T-Mobile should require SIM Card swaps to be done in person via their extensive network of stores.

84.   After the SIM Card Swap took place, T-Mobile Representatives should have advised Smith to check any brokerage accounts, bank accounts, crypto accounts, and immediately freeze/stop payments on all activity associated with those accounts.

85.   T-Mobile Representatives were either complicit with the theft or grossly negligent.

86.   T-Mobiles' officers and directors exhibited a conscious and reckless disregard for the security of its customers by failing to implement sufficient security protocols.

87.   Frye has filed a police report with Broward Sherriff's Office as well as with

the FBI.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE FEDERAL COMMUNICATION ACT

88.     Plaintiff incorporates by reference all facts and allegations of paragraphs 1-87 of this Complaint, as if the same were fully set forth herein.

89.     The FCA regulates interstate telecommunications carriers, including T-Mobile.

90.     T-Mobile is a "common carrier" or a "telecommunications carrier" engaged in interstate commerce by wire for the purpose of furnishing communication services within the meaning of Section 201(a) of the FCA. See 47 U.S.C. §201(a).

91.     As a "common carrier", T-Mobile is subject to the substantive requirements of Sections 201 through 222 of the FCA. See 47 U.S.C. §§201-222.

92.     Under Section 201(b) of the FCA, common carriers may implement only those practices, classifications, and regulations that are "just and reasonable" and practices that are "unjust or unreasonable" are unlawful.

93.     Section 206 of the FCA, entitled "Carriers' liability for damages" provides:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

94.     Section 207 of the FCA, entitled "Recovery of damages" further provides:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the [FCC] as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both remedies.

95.     Additionally,  Section 222(c)  of the FCA explicitly requires that telecommunications carriers protect its customers' CPNI. See 47 U.S.C. §222(c).

96.     According to the CPNI Rules:

> Safeguarding CPNI. Telecommunications carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI. Telecommunications carriers must properly authenticate a customer prior to disclosing CPNI based on customer-initiated contact, online account access, or an in-store visit.
>
> …
>
> In-store access to CPNI. A telecommunications carrier may disclose CPNI to a customer who, at a carrier's retail location, first presents to the telecommunications carrier or its agent a valid photo ID matching the customer's account information.

T-Mobile violated its duties under Section 222 of the FCA by failing to protect Plaintiff's CPI and CPNI by using, disclosing, or permitting access to Plaintiff's CPI and CPNI without the consent, notice, and/or legal authorization of Plaintiff as required by the FCA, in that upon information and belief:

     a.   during an in-store visit,  or over the phone, Plaintiff's CPI

and CPNI were disclosed to someone other than Plaintiff by an agent of Defendant;

b.  during an in-store visit,  or over the phone,, Plaintiff's CPI and CPNI were disclosed to someone, who was not properly authenticated by Defendant; during an in-store visit,  or over the phone, Plaintiff's CPI and CPNI were disclosed to someone, who did not first present a valid photo ID to Defendant.

97.   As alleged herein, T-Mobile failed to protect the confidentiality of Plaintiff's CPI and CPNI when it disclosed Plaintiff's CPNI and CPI to third-parties without Plaintiff's authorization or permission.

98.   T-Mobile's conduct, as alleged herein, constitute knowing violations of the FCA, including sections 201(b) and 222, as well as the CPNI Rules.

99.   T-Mobile is also liable for the acts, omissions, and/or failures, as alleged herein, or its officers, employees, agents, or any other persons acting for or on behalf of T-Mobile.

100.   T-Mobile's violation of the FCA allowed unauthorized parties to impersonate Plaintiff in transactions with others.

101.   T-Mobile violated the FCA, including Section 222, by allowing an unauthorized party to access Plaintiff's CPI and CPNI, resulting in, *inter alia*, Plaintiff's loss of his possessions, including 1.91130741 Bitcoin.

102.   As a direct consequence of T-Mobile's violations of the FCA, Plaintiff has been damaged through the loss of his property, namely 1.91130741 Bitcoin.

103.   Had T-Mobile not allowed the unauthorized access to Plaintiff's account, Plaintiff would not have suffered this loss.

104.   T-Mobile, by its inadequate procedures, practices, and regulations, engages in practices which, when taken together:

    a.   fail to provide reasonable, appropriate, and sufficient security to prevent unauthorized access to its customers' wireless accounts;

    b.   allow unauthorized persons to be authenticated; and

    c.   grant access to sensitive customer account information.

105.   In particular, T-Mobile failed to establish and implement reasonable policies, procedures and safeguards governing the creation, access, and authentication of user credentials to access customers' accounts, creating an unreasonable risk of unauthorized access.

106.   As such, in violation of the FCA, T-Mobile has failed to ensure that only authorized persons have access to customer account data and that customers' CPI and CPNI are secure.

107.   Among other things, T-Mobile:

    a.   failed to establish and enforce rules and procedures sufficient to ensure only authorized persons have access to T-Mobile customer accounts, including that of Plaintiff;

19

b. failed to establish appropriate rules, policies and procedures for the supervision and control of its officers, agents and employees;

c. failed to establish and enforce rules and procedures, or provide adequate supervision or training sufficient to ensure that its employees and agents follow such rules and procedures, to restrict access by unauthorized persons;

d. failed to establish and enforce rules and procedures to ensure T-Mobile's employees and agents adhere to the security instructions of customers with regard to accessing customers' accounts, including that of Plaintiff;

e. failed to adequately safeguard and protect its customers' wireless accounts;

f. permitted the sharing of and access to user credentials among T-Mobile's agents or employees without a pending request from the customer, reducing the likely detection of and accountability for unauthorized access;

g. failed to appropriate supervise employees and agents, who granted unauthorized access to customers' accounts, including that of Plaintiff;

h. failed to adequately train and supervise its employees, officers and agents to prevent the unauthorized access to customer accounts;

i. failed to prevent the ability of employees, officers and agents to

access and make changes to customer accounts without specific customer authorization;

j. allowed "porting out" of cell phone numbers without properly confirming that the request was coming from legitimate customers;

lacked proper monitoring and, therefore, failed to monitor its systems for the presence of unauthorized access in a manner that would allow T-Mobile to detect intrusions, breaches of security, and unauthorized access to customer information;

c. failed to implement and maintain readily available best practices to safeguard customer information (and indeed, seemed to suggest such practices were only available to those customers who "paid for" the privilege of having their information secured);

d. failed to timely diagnose and determine the cause of Plaintiff's service interruption;

e. failed to timely notify Plaintiff of the cause of Plaintiff's service interruption; and

f. failed to implement and maintain internal controls to help protect against account takeovers and SIM-swaps by unauthorized persons.

108.   The inadequate security measures, policies and safeguards employed by T-Mobile created a foreseeable and unreasonable risk of unauthorized access to the accounts of its customers, including that of Plaintiff.

109.   Upon information and belief, T-Mobile has been long aware of its inadequate security measures, policies and safeguards, and nevertheless, induced customers into believing that its systems were secure and compliant with applicable law.

110.   T-Mobile, despite knowing the risks associated with unauthorized access to customer accounts, failed to utilize reasonable and available methods to prevent or limit such unauthorized access.

111.   T-Mobile failed in its duty to protect and safeguard customer information and data pursuant to federal law.

112.   Had T-Mobile implemented appropriate and reasonable security measures, Plaintiff would not have been damaged.

113.   In sum, Defendant's security measures were entirely inadequate to prevent the foreseeable damage caused to Plaintiff.

### COUNT II: NEGLIGENCE

114.   Plaintiff incorporates by reference all facts and allegations of paragraphs 1-87 of this Complaint, as if  the same were fully set forth herein.

115.   T-Mobile owes a duty of care to its customers to ensure the privacy and confidentiality of CPI and CPNI during its provision of wireless carrier services, as required by both federal and state law.

116. By allowing unauthorized access to the personal and confidential information of legitimate T-Mobile customers, T-Mobile breached its duty of care to its customers and to foreseeable victims, including Plaintiff.

117. By failing to timely and properly diagnose the cause of Plaintiff's service interruption, T-Mobile breached its duty of care to its customers and to foreseeable victims, including Plaintiff.

118. But for the inadequate security protocols, practices, and procedures employed by T-Mobile in protecting customer data, including Plaintiff's private and confidential information, Plaintiff would not have suffered any damage.

119. But for the inadequate protocols, practices, and procedures employed by T-Mobile in diagnosing the causes of customers' service interruptions, T-Mobile breached its duty of care to its customers and to foreseeable victims, including Plaintiff.

120. But for those intentional actions and/or inaction of Defendant and its agents, Plaintiff would not have suffered damages.

121. And but for T-Mobile's inability to quickly and effectively diagnose and/or determine that Plaintiff's account was compromised by a SIM-swap – a fact that T-Mobile should have known – Plaintiff would not have suffered damages.

122. Plaintiff has been damaged through the loss of his property, namely 1.91130741 Bitcoin, with a current estimated value in excess of $87,000.00.

## COUNT III: GROSS NEGLIGENCE

123.   Plaintiff incorporates by reference all facts and allegations of paragraphs 1-87 of this Complaint, as if the same were fully set forth herein.

124.   T-Mobile, as required by federal and state law, owed Plaintiff a duty to properly handle and safeguard Plaintiff's CPI and CPNI and access to his account.

125.   T-Mobile was required to ensure its compliance with federal law and to protect the confidentiality of its customers' account data, including that of Plaintiff.

126.   Upon information and belief, T-Mobile willfully disregarded and/or showed reckless indifference to its duties under federal and state law to T-Mobile customers and to foreseeable victims of T-Mobile's wrongful acts.

127.   Having superior knowledge of prior account takeover attacks on T-Mobile customers' data and having the ability to employ internal systems, procedures, and safeguards to prevent such attacks, T-Mobile nevertheless failed:

       a.   to institute appropriate controls to prevent unauthorized access to customers' accounts;

       b.   utilized authentication systems it knew or should have known were vulnerable to account takeover attacks;

       c.   willfully disregarded the best practices of the industry in failing to implement systems to thwart such attacks; and

       d.   failed to appropriately hire, retain, supervise, train and control those officers, agents and employees who could

grant or obtain unauthorized access to customer account data.

128.    T-Mobile's policies, procedures and safeguards were completely ineffective and inadequate to prevent the unauthorized access to its customers' data, notwithstanding the requirements of the CFA, thus meeting the definition of gross negligence and warranting punitive damages for violating Florida Statute 768.72.

**COUNT IV: NEGLIGENT HIRING, RETENTION AND SUPERVISION**

129.    Plaintiff incorporates by reference all facts and allegations of paragraphs 1-87 of this Complaint, as if  the same were fully set forth herein.

130.    At all material times herein, T-Mobile's agents, officers, and employees, including, but not limited to, those directly or indirectly responsible for or involved in allowing unauthorized access to Plaintiff's confidential and proprietary account information, were under T-Mobile's direct supervision and control.

131.    Upon information and belief, T-Mobile negligently hired, retained, controlled, trained and supervised the officers, agents and employees under its control, or knew or should have known that such officers, agents and employees could allow unauthorized access to customer accounts, including that of Plaintiff.

132.    Upon information and belief, T-Mobile negligently failed to implement systems and procedures necessary to prevent its officers, agents and employees from allowing or obtaining unauthorized access to customer accounts, including that of Plaintiff.

133. Upon information and belief, T-Mobile's negligent hiring, retention, control, training and supervision allowed the unauthorized access to customers' accounts resulting in damage to T-Mobile customers and foreseeable victims in the public at large, including Plaintiff.

134. Given T-Mobile's experience with account takeover and SIM-swap attacks (including some perpetrated and/or assisted by Defendant's own employees, officers or agents), T-Mobile's failure to exercise reasonable care in screening, supervising, and controlling its officers, agents and employees was a breach of its duty to its customers, including Plaintiff.

135. T-Mobile's duty to its customers and foreseeable victims to protect its customers' data from unauthorized access is required by federal and state law.

136. It was entirely foreseeable to T-Mobile that unauthorized persons would attempt to gain unauthorized access to T-Mobile customers' data and, despite this, T-Mobile failed to implement sufficient safeguards and procedures to prevent its officers, agents and employees from granting or obtaining such unauthorized access.

137. Upon information and belief, T-Mobile engaged in the acts alleged herein and/or condoned, permitted, authorized and/or ratified the conduct of its officers, agents and employees.

138. As a direct consequence of T-Mobile's negligent hiring, retention, control and supervision of its officers, agents and employees, who enabled or obtained the unauthorized access to Plaintiff's account, Plaintiff was damaged through the loss

of his property, namely 1.91130741 BTC, with a current estimated value in excess
of $87,000.

**COUNT V: VIOLATIONS OF THE
COMPUTER FRAUD AND ABUSE ACT**

139.   Plaintiff incorporates by reference all facts and allegations of paragraphs 1-
87 of this Complaint, as if  the same were fully set forth herein.

140.   The CFAA governs those who intentionally access computers without authorization
or who intentionally exceed authorized access and as a result of such conduct, cause damage
and loss.

141.   As alleged herein, a SIM-swap attack requires the intentional access to customer
computer data by T-Mobile which exceeds its authority, and which conduct causes damage
and loss. As such, T-Mobile is subject to the provisions of the CFAA.

142.   T-Mobile's conduct, as alleged herein, constitutes a knowing violation of the
CFAA.

143.   T-Mobile is also liable for the acts, omissions, and/or failures, as alleged herein, of
any of its officers, employees, agents, or any other person acting for on behalf of T-Mobile.

144.   T-Mobile violated its duty under the CFAA by exceeding its authority to access the
computer data and breach the confidentiality of the proprietary information of Plaintiff
using, disclosing, or permitting access to Plaintiff's CPNI without the consent, notice,
and/or legal authorization of Frye as required by the CFAA.

145.   Section 1030(g) of the CFAA provides, in pertinent part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brough under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage….

146.   Plaintiff alleges he has suffered damages which exceed the threshold of $5,000.00 as required by Section 1030(c)(4)(A)(i)(I) of the CFAA.

147.   Plaintiff alleges T-Mobile's unlawful conduct has caused damage which exceeds approximately $87,000.00.

148.   Plaintiff has brought this claim within two (2) years of the date of discovery of the damage pursuant to Section 1030(g) of the CFAA.

149.   Plaintiff discovered damage on or about July 12, 2021.

150.   Upon information and belief, T-Mobile's conduct as alleged herein constitutes a violation of Section (a)(5)(A) of the CFAA.

151.   Upon information and belief, T-Mobile's conduct as alleged herein may constitute a reckless violation of Section (a)(5)(B) of the CFAA.

152.   Upon information and belief, T-Mobile's conduct as alleged herein may constitute an intentional violation of Section (a)(5)(C) of the CFAA.

153.   As a direct consequence of T-Mobile's violations of the CFAA, Plaintiff has been damaged in an amount to be proven at trial but, upon information and belief, exceeds

$87,000.00 plus fees and costs, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays for judgment against T-Mobile as follows:

1) Enter judgment for Plaintiff on all counts

2) Award compensatory damages to Plaintiff arising from T-Mobile's negligence;

3) Award statutory damages to Plaintiff for T-Mobile's FCA violations;

4) Award punitive damages to Plaintiff for T-Mobiles gross negligence and the conscious and reckless disregard of its customer's data in violation of Florida Statute 768.72.

5) Award statutory damages to Plaintiff for T-Mobile's CFAA violations;

6) Award Plaintiff costs and reasonable attorneys' fees;

7) Award Plaintiff prejudgment interest; and

8) Award Plaintiff such other and further relief as this Court deems just, fair, and proper.

Plaintiffs hereby demand a jury trial.

## VERIFICATION

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

_____
Kevin Frye

29

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and complete copy of this document was electronically filed with the clerk of courts in Southern District of Florida on the 10th day of August 2021.

Respectfully submitted,

Shrayer Law Firm, LLC.
912 South Andrews Avenue
Fort Lauderdale, FL 33316
Tel.   (954) 601-3732
Email: ghs@shrayerlaw.com

**/s/Glen H. Shrayer**

Glen H. Shrayer, Esq.
Fl Bar No. 57253

30