IN THE UNITED STATE DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 0:21-cv-61653-KMM**

KEVIN FRYE

    Plaintiff,

v.

T-MOBILE USA, INC.

    Defendant.
_____/

**DEFENDANT'S MOTION TO COMPEL ARBITRATION
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to 9 U.S.C. §§ 3 and 4, Defendant T-Mobile USA, Inc. d/b/a "Metro by T-Mobile" ("Metro") hereby respectfully moves this Court to enter an Order: (i) compelling individual arbitration of Plaintiff Kevin Frye's claims brought in the Verified Complaint (ECF No. 1), as required by his arbitration agreement with Metro; and (ii) staying this litigation until arbitration is complete.

**I.     INTRODUCTION**

Plaintiff Kevin Frye alleges T-Mobile failed to prevent third-party hackers from accessing his "Metro by T-Mobile" ("Metro") pre-paid phone service and ultimately using that access to steal 1.91130741 Bitcoin from his third-party cryptocurrency accounts, which had nothing to do with Metro. (Complaint ("Compl."), ECF No. 1, ¶¶ 1-2.) Based on these allegations regarding the unauthorized use of his Metro line of service, Mr. Frye asserts claims for violation of the Federal Communications Act; negligence; gross negligence; negligent hiring, retention, and supervision; and violations of the federal Computer Fraud and Abuse Act. (*See id.* ¶¶ 88-153.)

Mr. Frye is contractually required to bring his claims in arbitration. On several occasions over a period of years, Mr. Frye consented to Metro's Terms and Conditions ("T&Cs") and thereby agreed to arbitrate any disputes with Metro. In particular, the T&Cs provide for the arbitration of "any and all claims or disputes between you and us, in any way related to or concerning" Metro's services, privacy policies, or devices. (*See* Decl. of Hope Norris filed concurrently ("Norris Decl.") ¶ 30 (case changed).) Although Metro's T&Cs give customers the right to opt out of arbitration, Mr. Frye did not do so. (*Id.* ¶ 37.) Instead, he continuously used and benefited from Metro's service and assented to the arbitration provision on multiple occasions. (*Id.* ¶¶ 20, 23-26, 28.)

To the extent Mr. Frye disputes the scope or enforceability of the arbitration provision, that dispute goes to the arbitrator, as the parties agreed. But in any event, the arbitration agreement plainly covers the claims Mr. Frye brings against T-Mobile based on its alleged failure to protect Mr. Frye's account from hacking by third parties. Those claims arise directly from Metro's provision of telecommunications services, Mr. Frye's service agreements with Metro, and Metro's privacy policy regarding dissemination of customer account information.

The Court should therefore compel Mr. Frye to arbitrate his claims against T-Mobile and stay this action pending completion of that arbitration.

## II.      FACTUAL BACKGROUND

Defendant Metro by T-Mobile offers prepaid wireless phone plans to more than 18 million customers at industry leading rates. (Norris Decl. ¶ 2.) Plaintiff Frye is a Metro customer with a Metro wireless services account (the "Frye Account"). (*Id.*)

On or about July 12, 2021, Mr. Frye alleges that third-party "hackers" redirected calls and messages to his phone number to a different device, without his authorization. (Compl.

¶¶ 60-65.) He claims the hackers leveraged their access to his Metro line of service to find his passwords and access his third-party bank and cryptocurrency accounts. (*Id.* ¶¶ 65-72.) He seeks to recover $87,000 in bitcoin that he allegedly lost based on the hack. (*Id.* ¶ 72.)

As Mr. Frye concedes, he "entered into a contract with Metro" years ago. (Compl. ¶ 10.) In particular, Mr. Frye activated a line of service with Metro on March 14, 2011. (Norris Decl. ¶ 7.) At the time of activation, Mr. Frye agreed to service with Metro and was provided with information about Metro's T&Cs. (*Id.* ¶ 10.) The T&Cs contain a mandatory arbitration agreement. (*Id.* ¶¶ 31-32.)

Since his initial activation, Mr. Frye has not only continued to use his Metro device, but has upgraded the device several times, most recently on February 10, 2020. (Norris Decl. ¶ 9.) As part of that upgrade process, Metro sent Mr. Frye a link to the then-current T&Cs via short message service ("SMS") or text message to his phone number ending in 7877, in both Spanish and English, on February 10, 2020. (*Id.* ¶¶ 25-26.) The T&Cs advise customers that they agree to be bound to the T&Cs by "[a]ctivating service," "[u]sing your Service after your Service is activated or after you make a change or addition to your Service," or "[p]aying for the Service." (*Id.* ¶ 27.) By activating, using, and paying for Metro service, Mr. Frye agreed to be bound by Metro's T&Cs and the arbitration clause therein. (*Id.* ¶ 28.)

The arbitration agreement—to which Mr. Frye agreed—is featured prominently in the T&Cs in bold lettering. Under the heading **Metro by T-Mobile Terms and Conditions of Service**, there is a notice before the very first paragraph that reads, "**IMPORTANT: READ THIS AGREEMENT CAREFULLY. IT REQUIRES THE USE OF INDIVIDUAL ARBITRATION RATHER THAN JURY TRIALS OR CLASS ACTIONS TO RESOLVE**

**DISPUTES.**" (Norris Decl. ¶ 31.) Consistent with this notice, the T&Cs prominently disclose and explain the arbitration obligation as follows:

> **Dispute Resolution and Arbitration. We each agree that, except as provided below, any and all claims or Disputes between you and us, in any way related to or concerning the Agreement, our Privacy Policy, our Services, devices or products, will be resolved by binding arbitration.** . . . "Dispute" shall be given the broadest possible meaning and shall include any dispute, claim, or controversy arising from or relating to this Agreement or Services and/or Products provided under this Agreement, including but not limited to: (1) all claims for relief and all theories of liability, whether based in contract, tort, statute, regulation, ordinance, fraud, or misrepresentation; (2) all disputes regarding the validity, enforceability or scope of this arbitration agreement (with the exception of its class action waiver); (3) all disputes that arose before this Agreement; (4) all disputes that arise after the termination of this Agreement; and (5) all disputes that are the subject of a putative class action in which no class has been certified. . . .
>
> If you do not wish to be bound by this arbitration agreement, you must notify us of your desire to do so within 30 days of initiating Service, or, if you have never had the opportunity to opt out of arbitration, within 30 days of the date of the change notice giving you the opportunity ….

(*Id.* ¶ 32.)

Metro makes customers aware of this dispute resolution provision through a variety means. For example, when a customer purchases a new phone from Metro, he receives a one-page sheet explaining Metro's return and upgrade policies, highlighting important aspects of Metro's T&Cs, and providing the web address for the full T&Cs (the "Metro Information Sheet"). (Norris Decl. ¶¶ 20-22, Ex. H.) The Metro Information Sheet includes a section entitled "Metro Terms and Conditions," and the first line of this section reads in bold print:

> **By activating or using Metro Service, you agree to the Metro Terms and Conditions of Service. Metro requires Arbitration of Disputes unless you opt-out within 30 days of activating. Details and the full version can be viewed at metropcs.com/terms.**

4

(*Id.* ¶ 21.) In addition, all Metro customers, including Mr. Frye, receive a bill each month that refers the customer to the T&Cs and the arbitration provision. (*Id.* ¶ 23.) And each Metro device, such as a new phone, comes in a box with a sticker (the "Metro Box Sticker") on the outside that must be removed before the box can be opened. (*Id.* ¶ 24.) The Metro Box sticker references Metro's T&Cs and the applicability of the arbitration provision. (*Id.* ("By purchasing or opening this package, activating, using, or paying for Metro by T-Mobile service, you agree to the Metro by T-Mobile Terms and Conditions ('T&Cs') which provide for arbitration of disputes and waivers of class actions and jury trials.").) It also directs customers to the full T&Cs on Metro's website and instructions on how to opt out of the arbitration agreement. (*Id.*) In addition, when a customer purchases a new device from Metro, he receives a text message notifying him of the T&Cs and directing him to the website containing the T&Cs. (*Id.* ¶ 25.) (As noted above, Metro's records show that Mr. Frye received a text message notifying him of the T&Cs on February 10, 2020. (*Id.* ¶ 26.)) And finally, the T&Cs appear on Metro's website and prominently feature the agreement to arbitrate disputes. (*Id.* ¶ 36.)

Although the T&Cs provided Mr. Frye the opportunity to opt out of arbitration, he never did. (Norris Decl. ¶¶ 33, 37.) Mr. Frye regularly uses his Metro phone and service and pays his bill to this day, evidencing his assent to the terms that govern his usage. (*Id.* ¶¶ 28, 29.)

### III.     ARGUMENT AND AUTHORITIES

The Federal Arbitration Act ("FAA") applies to the Metro T&Cs because, by definition, a contract for telecommunication services affects interstate commerce. *See* 9 U.S.C. §§ 1-2; *Mehler v. Terminix Int'l Co. L.P.*, 205 F.3d 44, 47 (2d Cir. 2000); *see generally Goldberg v. Sweet,* 488 U.S. 252, 254-55 (1989) (telecommunications industry constitutes interstate commerce). Moreover, the FAA applies because the contracts between Metro and Mr. Frye are

contracts between citizens of different states. (Compl. ¶¶ 3-4.) Contracts between citizens of different states affect commerce, rendering the FAA applicable. *Kong v. Allied Prof. Ins. Co.*, 750 F.3d 1295, 1303 (11th Cir. 2014).[1]

Under the FAA, written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress passed the FAA to "reverse the longstanding judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The goal was "to ensure the enforcement of arbitration agreements according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 334 (2011). An "emphatic federal policy … favor[s] … arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

"[T]he FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1995 (11th Cir. 2008). When an arbitration provision satisfies both conditions, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)

---

[1] The T&Cs' choice of law provision also explicitly states that the FAA governs the agreement. (Norris Decl., Ex. A at PDF p. 13; *id.*, Ex. B at PDF p. 2; *id.*, Ex. C at PDF p. 3; *id.*, Ex. D at PDF p. 2; *id.*, Ex. E at PDF p. 2; *id.*, Ex. F at PDF p. 4; *id.*, Ex. G at PDF p. 2.) *See Preston v. Ferrer*, 552 U.S. 346, 353 (2009) (applying FAA's procedural rules pursuant to choice-of-law clause).

(citing 9 U.S.C. §§ 3, 4). As explained below, both conditions are satisfied here. The Court should direct Mr. Frye to arbitrate his claims against Metro.

Even if there were any doubt that the agreements are enforceable (which there is not), the Court should interpret any ambiguity in favor of enforcement. "The principal purpose of the FAA is to ensur[e] that private arbitration agreements are enforced according to their terms." *AT&T,* 563 U.S. at 344. The FAA both "embod[ies]" and declares a "national policy favoring arbitration." *Id.* at 346. The Supreme Court has interpreted the FAA as reflecting both "a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *Id.* at 333. "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Id.* at 339.

To further the FAA's purposes, the Supreme Court has emphasized that courts should interpret arbitration clauses liberally in favor of arbitration. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983). The Supreme Court has instructed that courts should "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Preston,* 552 U.S. at 357. "A prime objective of an agreement to arbitrate is to achieve streamlined proceedings and expeditious results." *AT&T,* 563 U.S. at 346.

The Supreme Court has consistently recognized this strong public policy in favor of arbitration. *See, e.g.*, *Am. Express Co. v. Italian Colors Rest.,* 133 S. Ct. 2304, 2308-09 (2013); *AT&T,* 563 U.S. at 339. Florida law is in accord: "Florida public policy favors resolving disputes through arbitration when the parties have agreed to arbitrate." *Maguire v. King,* 917 So. 2d 263, 266 (Fla. Dist. Ct. App. 2005), *approved sub nom. Jackson v. Shakespeare Found., Inc.,* 108 So. 3d 587 (Fla. 2013).

A. **Mr. Frye Should Be Compelled to Arbitrate His Claims.**

1. **Courts Regularly Enforce Metro's Arbitration Agreement.**

Courts across the country, including this Court, have repeatedly enforced Metro's arbitration agreement with customers like Mr. Frye based on similar evidence of the agreement. *See, e.g.*, *Williams v. MetroPCS Wireless, Inc.,* 2010 WL 1645099 (S.D. Fla. 2010); *MetroPCS Communications, Inc. v. Porter,* 273 So.3d 1025 (Fla. Ct. App. 2018); *Cuadras v. MetroPCS Wireless, Inc.*, 2011 WL 227591 (C.D. Cal. 2011); *Gittins v. MetroPCS Texas, LLC,* 2017 Tex. App. LEXIS 11597 (Tex. Ct. App. 2017); *Smith v. T-Mobile USA, Inc.*, 2018 WL 1933695 (D.S.C. 2018); *Smith v. T-Mobile USA, Inc.*, 2018 WL 1939501 (D.S.C. 2018). Indeed, the Supreme Court's seminal case on consumer arbitrations enforced a substantially identical arbitration clause used by AT&T, another wireless carrier. *See AT&T*, 563 U.S. at 333. Here, Mr. Frye agreed to resolve his disputes with Metro through streamlined, cost-efficient arbitration using the AAA, the nation's leading provider of arbitration services, and this Court should enforce that agreement.

2. **Mr. Frye Agreed to Be Bound by the Metro Arbitration Agreement.**

"[I]n determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005). Here, Florida law controls the issue since Mr. Frye is a resident of Florida and uses his Metro service in Florida. (*See* Compl. ¶¶ 3, 7; *see, e.g.*, Hope Decl. Ex. D at PDF p. 13 ¶ 26 (governing law includes FAA and law of state of customer's address).)

Contract formation under Florida law requires "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). "A valid contract—premised on the parties' requisite willingness to contract—may be

8

'manifested through written or spoken words, or inferred in whole or in part from the parties' conduct.'" *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014) (quoting *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011)).

Here, Mr. Frye's Verified Complaint concedes that he "entered into a contract with Metro." (Compl. ¶ 10.) As Metro's records confirm, in securing his Metro wireless services, Mr. Frye repeatedly agreed to arbitrate his disputes with Metro during the parties' years-long and continuing relationship. Mr. Frye accepted the arbitration agreements in the T&Cs when he first activated, used, and paid for his device. (Norris Decl. ¶¶ 8-9, 22, 24, 27-29.) He also received the Metro T&Cs on numerous occasions, including when he first initiated service and received the T&Cs as well as the Metro Information Sheet, and on February 10, 2020, when Metro sent Mr. Frye a link to the T&Cs by SMS in both Spanish and English. (*Id.* ¶¶ 10, 20, 26, Ex. H.) Although he had an opportunity to opt out of the arbitration provision, he chose not to. (*Id.* ¶¶ 33, 37.) Instead, he used Metro's device and service based on Metro's T&Cs, thereby agreeing to the arbitration provision of the T&Cs if a dispute arose regarding those services.

In addition to activating, using, and upgrading his device, Mr. Frye also manifested his agreement to arbitrate disagreements with Mero by continuously paying for his device and service. Every bill Mr. Frye received from Metro referred to the T&Cs. (Norris Decl. ¶ 23.) And Mr. Frye made dozens of payments on his account, including payments for service on March 14, 2011, the day Mr. Frye opened his account, and on January 29, 2014, April 8, 2015, January 7, 2018, February 10, 2020, all within one day of account upgrades. (*Id.* ¶ 28.) Metro's records show that from July 2019 to June 2020, Metro received at least twelve different payments to the Frye Account. (*Id.* ¶ 29.) Through his payments to Metro, Mr. Frye reaffirmed

his commitments to arbitrate any disputes with Metro involving his phone line, which Metro provided to him at industry-leading rates based on the terms reflected in its T&Cs.

> B. **Mr. Frye's Claims Are Subject to Arbitration.**
>
> > 1. **The Agreement Delegates Questions on Arbitrability to the Arbitrator.**

The Court should compel Mr. Frye to arbitrate based on his enforceable promise to do so. There are no further issues to be decided by the Court. Indeed, even if Mr. Frye contests whether his claims are subject to arbitration, the parties agreed to delegate all gateway or threshold questions of arbitrability to the arbitrator, and that delegation is enforceable.

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S. Ct. 524, 528 (2019). Here, the parties expressly delegated arbitrability to the arbitrator: the T&Cs define the disputes subject to arbitration to include "all disputes regarding the ... scope of this arbitration agreement[.]" (Norris Decl. ¶ 33.) "In th[e]se circumstances, a court possesses no power to decide the arbitrability issue." *Schein*, 139 S. Ct. at 529. Indeed, "as the Supreme Court recently ruled, even in instances where the argument in support of arbitrability is wholly groundless, the threshold issue of arbitrability nonetheless must be decided by the arbitrator, not the Court, if the contract delegates the arbitrability question to an arbitrator." *Carnevali v. Yardley Car Co.*, 452 F. Supp. 3d 1321, 1325 (S.D. Fla. 2019) (citing *Henry Schein*, 139 S. Ct. 524).

Further, the parties agreed to arbitrate pursuant to the AAA rules, and those rules likewise delegate gateway issues to the arbitrator. Metro's T&Cs expressly incorporates the AAA (and previously JAMS) arbitration rules. (*See* Norris Decl., Ex. A at PDF p. 13; *id.*, Ex. B at PDF p. 2; *id.*, Ex. C at PDF p. 3; *id.*, Ex. D at PDF p. 2; *id.*, Ex. E at PDF p. 2; *id.*, Ex. F at PDF p. 4; *id.*,

Ex. G at p. 3.) And AAA's rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim" and that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part." (Decl. of James H. Moon ("Moon Decl.") filed concurrently, Ex. A (AAA Consumer Arbitration Rules) R-14; *id.*, Ex. B (AAA Commercial Arbitration Rules) R-7.) Likewise, JAMS rules provide that "Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter," "including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought." (Moon Decl., Ex. C (JAMS Arbitration Rules) Rule 11; *id.*, Ex. D (JAMS Streamlined Rules) Rule 8.)

When an arbitration provision states that arbitration shall be conducted pursuant to the AAA or JAMS rules, courts consistently hold that the arbitration provision has made a clear delegation of scope-determining authority to an arbitrator: "[W]e read an arbitration agreement incorporating [arbitral] rules containing [delegation] language as clear and unmistakable evidence that the parties ... intended to delegate questions of arbitrability to the arbitrator." *JPay, Inc. v. Kobel*, 904 F.3d 923, 938 (11th Cir. 2018); *see also Gorelik v. Dillion*, 2010 WL 11553317, at *5 (S.D. Fla Dec. 15 2010) ("The Eleventh Circuit has found that when … an arbitration agreement incorporates (by reference) arbitration rules providing the arbitrator the authority to rule on his or her own jurisdiction, including the validity and scope of the arbitration provision, the parties 'clearly and unmistakably' agreed that the arbitrator—and not a court— should decide issues pertaining to arbitrability.") (citing *Terminix Int'l Co., L.P. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005)); *Fellype v. Citibank, N.A.*, 2020 U.S. Dist.

LEXIS 247521, at *16 (S.D. Fla. Nov. 6, 2020) (finding clear designation based on incorporation of AAA or JAMS rules).

Because the parties delegated arbitrability issues to the arbitrator pursuant to the arbitral bodies' rules, the Court need not go beyond a determination that Mr. Frye entered into an agreement to arbitrate. Instead, the Court should compel arbitration and allow the arbitrator to resolve any purported issues of arbitrability. *See Henry Schein*, 139 S. Ct. at 529.

### 2. Mr. Frye's Claims Fall Within the Broad Scope of the Agreement.

In any event, even though analysis of the scope of the arbitration agreement should be left to the arbitrator as required by *Henry Schein*, there can be no question that Mr. Frye's claims fall within the scope of Metro's arbitration clause. The mandatory arbitration provision to which Mr. Frye agreed is broad, applying to "**any and all claims or Disputes between [Metro] and [Mr. Frye], in any way related to or concerning the Agreement, [Metro's] Privacy Policy, [Metro's] Services, [or] devices or products.**" (Norris Decl. ¶ 30.) Mr. Frye's claims fall directly within the scope of the arbitration clause because they relate to or concern his Metro Account and Metro's devices and products. Indeed, Mr. Frye's claims rest on Metro's alleged failure to safeguard his phone account and service, including a claim that it honored an unauthorized request for a SIM card, which allegedly allowed third-party fraudsters to access the line of service Metro provided to Mr. Frye. (Compl. ¶¶ 88-153.) As pled, these claims, including the statutory claims, arise directly and exclusively from Metro's services, privacy policy, and products. Thus, Mr. Frye's claims fall within the scope of the arbitration agreement as they relate to his Account with Metro and Metro's products, devices, and services.

### C. The Action Should Be Stayed Pending Arbitration.

The FAA provides that once satisfied that the suit should be moved into arbitration, a court "*shall* on application of one of the parties *stay the trial of the action*." 9 U.S.C. § 3

(emphasis added). As a result, when a plaintiff asserts claims within the scope of an enforceable arbitration agreement, as Mr. Frye's claim do here, "the court should order that the action be stayed pending arbitration." *Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698, 699 (11th Cir. 1992). Because Mr. Frye should be made to arbitrate his claims, the Court should stay this action pending completion of arbitration.

## IV.  CONCLUSION

For the reasons stated herein, Mr. Frye contractually agreed to arbitrate his claims rather than pursuing them in court. Accordingly, Metro respectfully requests that this Court grant its Motion to Compel Arbitration and stay this case in favor of arbitration.

## CERTIFICATE OF GOOD-FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(B), the undersigned counsel for T-Mobile has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: /s/ *Matthew R. Tuchman*

Matthew R. Tuchman
Florida Bar No. 109297
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200 Phone
(202) 973-4499 Fax

James H. Moon (*pro hac vice* pending)
Matthew C. Onyett (*pro hac vice* pending)
Los Angeles, CA 90017
Tel:  (213) 633-6819
Fax:  (213) 633-6899

*Attorneys for Defendant T-Mobile USA, Inc.*